MICHAEL, Circuit Judge,
concurring in part and dissenting in part:
I readily concur in parts I through IV of the majority opinion. I respectfully dissent, however, from the majority’s holding (in part V) that the Board exceeded its authority in ordering Fieldcrest to grant its union workers the same wage increase the company unilaterally and discriminatorily granted its workers in unrepresented plants. I dissent to that extent because I believe substantial evidence in the record as a whole supports the Board’s finding that Fieldcrest violated § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), and because the Board has “the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review.” Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898-99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984) (interpreting NLRA § 10, 29 U.S.C. § 160). Moreover, the majority’s holding on the pay remedy is inconsistent with our own precedent and creates an inadvisable split of authority between us and our sister circuits.
I.
Since 1978 Fieldcrest’s practice with respect to wage increases had been to negotiate a wage increase for its union-represented plants first and afterward to give the same increase to its non-union plants.[1] The Board found that as part of a campaign to discour *82 age union membership at other plants, Field-crest (in 1991) departed from its usual and customary practice of handling wage increases. Specifically, before entering into wage negotiations with the union, it unilaterally granted a 5.5 percent wage increase to workers who were not represented by the union. Fieldcrest granted this increase even though the company had lost money in the first part of the year. In wage negotiations Fieldcrest refused to offer the same wage increase to represented workers, offering only a 4.5 percent increase.[2]
The Board found that numerous Fieldcrest supervisors told employees at the unrepresented plants that they received their larger wage increase as a reward for defeating the union. Supervisors at union plants told employees that they were denied a pay increase because they were at a union plant. One supervisor said that the company insisted on the smaller wage increase “to discredit the Union and try to drive it out of the mill.” The Board found:
[Fieldcrest’s] discriminatory departure from its practice of granting identical wage benefits to its represented and unrepresented employees indicates [Fieldcrest’s] desire to frustrate bargaining and to “undermine and destroy” the Union. [Field-crest’s] extreme [anti-]union animus is further evidenced by the numerous unfair labor practice violations discussed in the [administrative law] judge’s decision. Such a pattern of discriminatory conduct is inconsistent with good-faith bargaining, and reflects [Fieldcrest’s] determination not to reach agreement with the Union. In addition, [Fieldcrest’s] agents made statements both during and outside the negotiations which strongly suggested that its wage-increase proposals to the Union were intended both to punish the Union for its attempts to organize the unorganized plants and to undermine any further attempts at organization. These statements came from the highest levels of [Fieldcrest’s] management as well as several supervisors on the shop floor.
Fieldcrest Cannon, Inc., 318 NLRB No. 54, at 2-3 (1995). The Board concluded that the company’s conduct violated NLRA §§ 8(a)(1), (3) & (5).
II.
The Board’s choice of remedy must be enforced unless it is arbitrary, capricious, or manifestly contrary to the statute. ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 322-24, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994) (on remedial issues “the Board’s views merit the greatest deference”); accord Sure-Tan, 467 U.S. at 898-99, 104 S.Ct. at 2812-13 (1984); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); Monfort, Inc. v. NLRB, 965 F.2d 1538, 1548 & n. 15 (10th Cir.1992); Conair Corp. v. NLRB, 721 F.2d 1355, 1385-87 (D.C.Cir.1983), cert. denied, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984). Given Fieldcrest’s “scorched earth, take-no-prisoners approach to stop unionization without regard to statutory limitations,” Maj. Op., ante at 73,[3] the Board’s chosen remedy was appropriate.
A.
I recognize that a simple violation of the duty to bargain in good faith cannot justify the pay remedy the Board ordered. H.K. Porter Co. v. NLRB, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). If an employer refuses to bargain in good faith in violation of § 8(a)(5), the Board may order the employer to bargain in good faith but may not compel the employer to accept any particular union demand. The rule is intended to allow employees and employers to *83 make their own contract. The Board exceeds its authority when it attempts to write the parties’ contract for them. NLRB v. Insurance Agents’ Int’l Union, AFL-CIO, 361 U.S. 477, 488, 80 S.Ct. 419, 426-27, 4 L.Ed.2d 454 (1960); NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829-30, 96 L.Ed. 1027 (1952). “[W]hile the Board does have power ... to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement.” H.K. Porter, 397 U.S. at 102, 90 S.Ct. at 823. “[T]he duty to bargain collectively does not carry with it the duty to reach an agreement.” Id. at 104, 90 S.Ct. at 824 (quoting S.Rep. No. 573, 74th Cong., 1st Sess., 12 (1935)). This rule is embodied NLRA § 8(d), which provides that
to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.
I also recognize that in Clearwater Finishing Co. v. NLRB, 670 F.2d 464, 468 (4th Cir.1982), we reaffirmed the rule barring the Board from “ordering agreement” on contract terms. The majority’s refusal to enforce the pay remedy would therefore be correct if all Fieldcrest had done was violate its duty to bargain in good faith.
Fieldcrest, however, did more.
B.
The Board additionally found that Field-crest’s creation of an unprecedented wage disparity amounted to a completely separate kind of unfair labor practice: discriminatory withholding of a “wage increase from its represented employees in order to discourage support for the Union.” Fieldcrest Cannon, Inc., 318 NLRB No. 54, at 3; see also id. at 3 n. 5 (“when, as here, an employer has always treated wages on a company-wide basis and deviates from that policy during collective-bargaining negotiations in a context of statements to the effect that employees are being punished for having selected union representation, the conduct violates Sec. 8(a)(5), (3), and (1)”) (concurring statement of Member Stephens). Discriminatory withholding of wages, regardless of whether those wages also are the subject of negotiation, separately violates § 8(a)(3) of the National Labor Relations Act, and the Board so found.[4] The majority has simply ignored this portion of the Board’s decision.
The Board did not order Fieldcrest to grant its union employees a wage increase to redress the violation of NLRA § 8(a)(5) (breach of duty to bargain in good faith). Instead, the Board imposed the remedy to redress Fielderest’s intentional violations of NLRA § 8(a)(3) (discrimination motivated by a desire to discourage union membership) and NLRA § 8(a)(1) (interference with protected concerted activity).[5] Indeed, the concurring opinion recognizes that Fieldcrest’s aim in refusing its represented workers the wage increase it gave to unrepresented workers was “discouraging unionization at its other plants.” Ante at 77. Creating a wage disparity with the motive of discouraging unionization is a clear violation of the National Labor Relations Act. Acme Die Casting v. NLRB, 26 F.3d 162, 166-67 (D.C.Cir.1994); *84 Peabody Coal Co. v. NLRB, 725 F.2d 357, 366-67 (6th Cir.1984); Eastern Maine Medical Ctr. v. NLRB, 658 F.2d 1, 7-8 & n. 4 (1st Cir.1981); South Shore Hosp. v. NLRB, 630 F.2d 40, 44-45 (1st Cir.1980), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); Parma Indus., 292 NLRB 90, 1988 WL 214278 at *1-2 (1988). “By effectively announcing to [represented workers] that they would be excluded from any increase, the [employer] ... discredited and disparaged the Union in the eyes of its members” in violation of § 8(a)(3). Rocky Mountain Hosp., 289 NLRB No. 138, 130 L.R.R.M. 1487, 1489, 1988 WL 214294 (1988) (internal quotation marks omitted).[6]
The majority has not explained why an employer may shield its discriminatory conduct from Board scrutiny simply because the acts of discrimination occur contemporaneously with negotiations. The majority’s decision conflicts with longstanding Fourth Circuit precedent holding that the Board may order an employer to return to its prior practices even when the union is seeking in negotiations to encourage the employer to do so. For more than twenty years it has been the law in this circuit that an employer may not persist in a practice that has been “appraised as discriminatory in itself’ simply because in a negotiation session the union has sought to dissuade the employer from persisting in the unlawful practice. E.I. Dupont De Nemours & Co. v. NLRB, 501 F.2d 135, 137 (4th Cir.1974) (per curiam) (employer eliminated job-related privileges in represented units but allowed unrepresented workers to retain privileges; Board properly may order restoration of privileges and bar employer’s negotiator from insisting to impasse on their elimination); NLRB v. Atlantic Int’l Corp., 664 F.2d 1231, 1233 (4th Cir.1981) (employer unilaterally reduced wages of union workers at time when employer was seeking to negotiate a wage reduction; Board properly ordered restoration of wage); cf. NLRB v. Weathercraft Co., 832 F.2d 1229, 1232 (10th Cir.1987) (Board may order remedy “restoring the economic status quo”).
As in Atlantic Int’l the Board here simply ordered “a restoration of the status quo ante.” Id. at 1233. Fieldcrest’s prior policy was not to allow any wage disparity to exist between its union and non-union workers, but here Fieldcrest unilaterally imposed a disparity in an avowed effort to break the union and to dislodge it from the plants it had organized. If “deprivation” of a benefit in contravention of an employers’ past policy of granting it “would discourage the choosing of representation by a union,” the Board may order an employer to grant the benefit, regardless of whether the union is contemporaneously seeking the same benefit at the bargaining table. E.I. Dupont, 501 F.2d at 136.
In both H.K. Porter and in Clearwater, by contrast, the union was asking for an unprecedented benefit. In H.K Porter the union sought check-off (i.e., automatic deduction of union dues from employee paychecks), something the employer never had allowed in the past. In Clearwater the union demanded both check-off and a retroactive increase in pay. In this case the union simply asked the employer to follow its existing policy of maintaining equivalent wages between its union and non-union plants. The distinction between the situation presented in Clearwater and that in Dupont and Atlantic Int’l is so straightforward that the Clearwater panel did not even cite Dupont and Atlantic Int’l.
Today’s judgment on the pay issue also puts us in conflict with the law of every other circuit that has considered the question. A circuit split should not be created “without strong cause.” Mayer v. Spanel Int’l Ltd., 51 F.3d 670, 675 (7th Cir.) (Easterbrook, J.), cert. denied, — U.S. -, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); accord Butler County Memorial Hosp. v. Heckler, 780 F.2d 352, 357 (3d Cir.1985). The majority does not explain why this case is so compelling as to justify a departure from applicable precedent in this area.
In Eastern Maine the First Circuit upheld a make-whole remedy identical to the one *85 ordered here. There the employer departed from past practices and withheld from represented workers a wage increase it granted to unrepresented workers. The employer’s conduct was held to violate NLRA § 8(a)(3) because the employer created the wage disparity with the intent of discouraging union membership. Eastern Maine, 658 F.2d at 9-10. The First Circuit expressly rejected the employer’s defense — identical to the defense asserted here — “that it legitimately withheld the wage increase as an economic weapon to improve its bargaining position.” Id. “[A] make whole order [] to remedy a section 8(a)(3) violation [ ] is a standard type remedy in discrimination cases and does not exceed the Board’s authority.” South Shore, 630 F.2d at 45 n. 7; accord Pegasus Broadcasting of San Juan, Inc. v. NLRB, 82 F.3d 511, 513 (1st Cir.1996).
The majority’s decision today conflicts not only with the law of the First Circuit but also with the law of the Seventh, the Sixth, and the District of Columbia Circuits. In NLRB v. Thill, Inc., 980 F.2d 1137 (7th Cir.1992), the employer made a pay increase retroactive for its unrepresented workers but refused to do so for its represented workers. The Board found that the employer violated § 8(a)(3), and the Seventh Circuit enforced the Board’s make-whole order. Judge Pos-ner said for the court that the “workers’ entitlement to backpay cannot be doubted” even though the union had sought to negotiate wage increase retroactivity. Thill, 980 F.2d at 1141. Indeed, the court held that workers were entitled to be paid interest on the increase. Id.[7] In Peabody Coal, 725 F.2d at 366, the Sixth Circuit expressly followed the Eastern Maine rule and enforced the Board’s make-whole remedy. And the District of Columbia Circuit held, in an opinion written by Judge Mikva, that where a wage increase given to unrepresented workers and denied to represented workers amounted to “a deviation from accepted prior practice” and the decision to create a wage disparity “was motivated by anti-union animus, [or by] a discriminatory desire to discourage union membership,” the Board may find a § 8(a)(3) violation and order the employer to make its union employees whole by granting them the same increase. Acme Die Casting, 26 F.3d at 165-66.
The majority’s holding on the pay remedy puts us at odds with our own precedent and with the law of our sister circuits. Accordingly, I respectfully dissent on that issue. Otherwise, I concur.

. There were only a few immaterial departures from this practice. In 1987 and 1988 Fieldcrest employees at certain newly-acquired plants received a smaller wage increase in order to standardize their pay with the pay scale of employees at the plants the company already owned. In 1986 the company delayed implementation of a pay increase at union plants due to a dispute over how third-shift pay should be handled. In 1981 a wage increase in union plants was delayed due to a dispute over payment of insurance premiums. The Board's finding that these scattered incidents were not material alterations in Fieldcrest’s wage increase policy is supported by substantial evidence in the record as a whole. See NLRA § 10(e), 29 U.S.C. § 160(e).

. The concurring opinion characterizes the wage increase disparity as a "1% difference.” Cone. Op., ante at 74. Although the disparity is a one percentage point difference when total wages are compared, the magnitude of the disparity is much greater when the amounts of the increases are compared to each other. Non-union employees got a raise that was 22 percent higher than union employees.

. Indeed, Fieldcrest mounted “a Stalingrad defense of sorts to the threat of unionization, fighting the Union, by any means at hand, from rock to rock and from tree to tree.” NLRB v. Horizon Air Servs., 761 F.2d 22, 29 n. 5 (1st Cir.1985).

. NLRA § 8(a)(3) prohibits “discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.”

. “Protected concerted activity” means the exercise of any right guaranteed by NLRA § 7, 29 U.S.C. § 157, including:
the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and ... the right to refrain from any or all such activities except [with respect to certain union shop requirements, if negotiated pursuant to NLRA § 8(a)(3)],

. Another union, the United Textile Workers, had organized one Fieldcrest plant. Fieldcrest granted UTW-represented workers the same increase it granted unrepresented workers. Thus Field-crest may also have impermissibly favored one union over another, in violation of NLRA § 8(a)(2). The Board did not, however, address whether Fieldcrest violated this section.

. Graphic Communications International Union v. NLRB, 977 F.2d 1168, 1171 (7th Cir.1992), upon which the concurring opinion relies, see ante at 77, is inapposite because that case relates only to an employer’s duty to disclose financial information to union negotiators. The Board did not find a § 8(a)(3) violation in that case.